JOAQUÍN GARCÍA RODRÍGUEZ, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. J. M. ALMODÓVAR ACEVEDO, JUEZ, demandado.

Número 2401.

*Sometido:* 21 de marzo de 1960. *Resuelto:* 17 de mayo de 1961.

----

674

*Rodríguez Ema & Rodríguez Ramón,* abogados del peticionario; *Juan T. Peñagarícano, Víctor M. Marchán, Abrahán Freyre* y *Nieves Agostini de Torres,* abogados del Administrador de la Administración de Estabilización Económica de Puerto Rico; *Jorge Benítez Gautier,* abogado de los inquilinos que intervinieron en el recurso ante el Tribunal Superior.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El peticionario dio en arrendamiento a varios inquilinos siete locales comerciales en un edificio de su propiedad situado en la Avenida Borinquen núm. 2054, Santurce, del término municipal de San Juan, Puerto Rico, por un canon de $250 mensuales a cada local con excepción de uno que el canon era de $225. Los locales fueron inscritos por primera vez en la Administración de Estabilización Económica en 2 de febrero de 1955.

Después de practicar la correspondiente investigación la indicada agencia administrativa notificó al casero en 2 de noviembre de 1955 que se proponía fijar el alquiler máximo de los referidos locales, sobre bases de comparabilidad con locales similares de acuerdo con el alquiler prevaleciente al 1ro. de octubre de 1942, en $109.70 para cada local, con excepción del ocupado por la inquilina Drugs & Cosmetics, Inc., que se fijaría en $140.55.

El casero se opuso a la propuesta rebaja en los cánones de arrendamiento, entre otros motivos, porque dichos cánones debían fijarse a base del costo de construcción por tratarse de construcciones nuevas.

Después de celebrarse la vista correspondiente, la Administración emitió, en 3 de agosto de 1956, órdenes fijando los siguientes cánones de arrendamientos:

| | |
|---|---|
| Drugs & Cosmetics, Inc. | $140. 55 |
| Rafael Ramírez Chévere | 142. 70 |
| Germánico Vando | 142. 70 |
| Joyería Yamin, Inc. | 142. 70 |
| Luis Rodríguez Cruz | 142. 70 |
| J. Rodríguez Rolán | 142. 70 |
| George Rudes | 142. 00 |

En un recurso de revisión llevado por el casero, el Tribunal Superior, Sala de San Juan, confirmó por sentencia las indicadas órdenes. Expedimos un auto de certiorari para revisar la sentencia del Tribunal Superior.

A fines de 1954 y terminando a principios de 1955 se realizaron reformas sustanciales en el edificio. El apoderado del casero declaró que dichas reformas consistieron en la demolición de las paredes frontales para la instalación de vitrinas, demolición sustancial de un muro al frente, sustitución de las ventanas y paredes laterales y empañetado de las mismas quedando las paredes fundamentalmente como existían, construcción de un alero en la pared trasera para la construcción de servicios sanitarios, instalación de pisos de "Asphalt Tile", instalación de plafón nuevo, instalación de nuevas divisiones de los locales, sustitución de la instalación eléctrica por una nueva, instalación de nuevo cartón en el techo e instalación de una verja en la parte de atrás. Declaró además que el edificio había sido construido en 1918; que el piso del edificio fue cubierto por "asphalt tile" pero que es el mismo piso que tenía antes; que de las paredes del frente quedaron las columnas; que a las paredes laterales todo lo que se les hizo fue quitarles las ventanas reempla-

zándolas por otras y que fundamentalmente quedaron como estaban. Declaró también que al local ocupado por Drugs & Cosmetics, Inc., no se le hizo reforma alguna y quedó tal como estaba antes.

Antes de la reforma el edificio estaba dividido por una pared de hormigón en dos locales. El de la izquierda entrando de frente, ocupado por Drugs & Cosmetics, Inc., tiene un área aproximada de 2,885.75 pies cuadrados, equivalentes a 24.9 por ciento, de la edificación total.

Según el perito ingeniero presentado por el casero, el local de la izquierda no mejorado tiene un valor estimado de $5 el pie cuadrado, y la parte dividida en seis locales tiene un valor estimado de $66,176 calculado a $7 el pie cuadrado.

El local de la derecha entrando que fue el único mejorado se subdividió en seis pequeños locales de alrededor de 1,461 pies cuadrados cada uno, usándose divisiones de "durotex" a un costo aproximado de $252 para cada división. La pared del frente fue demolida, dejándose en pie las columnas. Entre columna y columna se construyeron vitrinas con paredes y techo de hormigón. La pared trasera sufrió una demolición parcial en su parte superior y detrás se construyeron seis pequeños cuartos de baño en bloques de hormigón de 4″. Las tres paredes laterales, el piso y el techo son los mismos, si bien el piso fue cubierto con "asphalt tile"; al techo que también está sostenido por una serie de viguetas de acero, se le puso un plafón de cartón nuevo, y en las paredes se sustituyeron las ventanas y además se hicieron otras reparaciones menores.

Los ingenieros de la Administración de Estabilización Económica que realizaron una inspección del edificio declararon que ". . . cualquier ingeniero que vaya allí vería que esas mejoras no llegan al por ciento de construcción necesaria para que se amerite que el edificio se considere una construcción nueva. En otras palabras: las paredes, lado izquierdo, derecho y posterior, son viejos, la plataforma de

la parte de atrás es vieja, el techo es el mismo, solamente que lo repararon." Estas mejoras fueron evaluadas por los indicados ingenieros en la suma de $20,699.81.

En la solicitud para la póliza de seguro de obreros, núm. 82637, serie 84020 formalizada en 7 de octubre de 1954 con el Fondo del Seguro del Estado el propio casero explica que la póliza era "para cubrir los trabajos de alteración estructural de un edificio de hormigón armado" en la dirección que ocupa el edificio con una nómina estimada de $5,590. Esta póliza fue ampliada por otra con una nómina estimada de $450 "para cubrir los trabajos de construcción e instalación de vitrinas" en el mismo edificio.

El artículo 6 de la Ley de Alquileres Razonables (17 L.P.R.A., sec. 186) dispone que si la vivienda o edificación no hubiera estado arrendada en primero de octubre de 1942, el Administrador fijará el alquiler razonable sobre la base de los alquileres que prevalecían en Puerto Rico para viviendas y edificios similares durante el año que terminó el primero de octubre de 1942. "Si la vivienda o edificación fuese de construcción posterior al primero de octubre de 1942, Administrador fijará el alquiler razonable sobre la base del coste de construcción de dicha vivienda o edificio; entendiéndose que en ningún caso el alquiler razonable, computado por una anualidad, excederá del doce (12) por ciento del coste de la obra." Dicho artículo concede también poderes al Administrador para fijar el alquiler razonable decretando aumento en el alquiler prevaleciente en el caso en que, "a juicio suyo, así se justifique por razón de mejoras de importancia capital," . . . . pero ningún aumento por tal razón excederá el alquiler fijado en más de un quince (15) por ciento.

El artículo 24 declaró exentas de las disposiciones de la ley, en cuanto al importe del canon a cobrarse durante la emergencia, toda propiedad de alquiler para negocios y propósitos comerciales e industriales, o destinada a vivienda que

empezase a edificarse efectivamente en el transcurso del año 1946 y que se terminase dentro de un año, o de la prórroga, no mayor de un año adicional, que por causa justificada concediese el Administrador.

En *Aponte v. Tribunal de Distrito*, 68 D.P.R. 839—citado por el peticionario en apoyo de su contención—resolvimos que a los fines del artículo 24 de la Ley de Alquileres Razonables, eran construcciones nuevas, exentas de contrato, dos locales comerciales en un edificio construido en el cual hubo que demoler paredes interiores, construir doce columnas para sostener unas vigas de acero, cambio de fachada y adición de una tercera planta. Para la fecha en que se resolvió dicho caso, mayo 25 de 1948, la Legislatura había aprobado la Ley Núm. 201 de 14 de mayo de 1948, insertando entre otras cosas, un nuevo párrafo al artículo 6, que dispone:

"Ninguna mejora capital, ni la reconstrucción del edificio, ni la conversión de una vivienda en local comercial o de un local comercial en vivienda, se considera nueva edificación a los efectos del artículo 24 de esta ley."

En la nota 3 de la opinión emitida en el caso de *Aponte*, supra, el Tribunal hizo constar que tenía conocimiento de la aprobación de la Ley núm. 201, pero agregó: "Aceptando, sin resolverlo, que esta enmienda pueda tener el alcance de autorizar al Administrador a fijar el alquiler de los locales aquí envueltos, el presente caso no queda afectado. Las órdenes dictadas por el Administrador el 14 de agosto de 1947, son nulas por no estar autorizadas por la ley vigente en dicha fecha."

La Ley núm. 201 aclaró y dejó establecido definitivamente que locales comerciales como los envueltos en el caso de *Aponte*, no eran, a los fines de la ley, edificaciones nuevas. Véase, *Ledesma, Admor. v. Tribl. de Distrito*, 71 D.P.R. 87.

*Rodríguez v. Corte*, 69 D.P.R. 543, citado también por el peticionario, no resuelve a su favor el punto en discusión. Allí decidimos que puede prosperar una demanda de desahu-

cio por la causal de demolición para construir un edificio nuevo aun cuando la nueva construcción tenga trazas del edificio anterior. Como la ley requería que el arrendador proyectara la demolición total o parcial del edificio arrendado para construir uno nuevo, dijimos que esto último no quiere decir que no puedan quedar trazas del edificio anterior porque si así lo resolviéramos, estaríamos frustrando la intención legislativa al efecto de que era suficiente la demolición parcial.

En vista de lo expuesto no podemos convenir con el peticionario en que la Administración de Estabilización Económica cometiera error, al fijar los cánones de arrendamiento a los seis locales comerciales a base de comparabilidad. Si de algo pecó la agencia administrativa, según lo admite ante nos, fue de generosidad con el casero. Aun cuando su ingeniero valoró las mejoras en $20,699.61, dicho importe fue elevado a $40,481.71 y sobre dicho importe le hizo una concesión rental de 12 por ciento anual, sin limitación del 15 por ciento del alquiler correspondiente por comparabilidad.

El Tribunal Superior no cometió error al confirmar la actuación de la agencia administrativa fijando los alquileres razonables en la forma que lo hizo.

Tampoco podemos convenir con el peticionario en que las órdenes dictadas por el Administrador en este caso sean nulas por falta de conclusiones de hecho y de derecho. Según indica en su alegato, página 9, el Administrador ha debido formular, para que las órdenes fueran válidas, conclusiones de hechos básicos relativos al costo de construcción y valor del solar a base del valor de solares vendidos en esa misma área.

Surge de todo el récord de los procedimientos habidos ante la agencia administrativa que la controversia giró sobre la cuestión fundamental de si los seis locales comerciales eran o no una nueva construcción a los fines de determinar la base para la fijación del canon de arrendamiento y la prueba de

.las partes tendió a establecer el valor de las obras realizadas en el edificio. Del expediente aparece que el Administrador, aceptó como valor de las mejoras, la suma de $40,841.71. En las órdenes impugnadas se hace constar expresamente que el alquiler máximo se fija a base de comparabilidad con el alquiler prevaleciente para locales similares. El tribunal a quo, tuvo pues ante sí todos los elementos necesarios para revisar adecuadamente las órdenes impugnadas y resolver si la agencia administrativa había decidido a base de la evidencia y de la ley. La agencia administrativa formó un récord completo de los procedimientos llevados a cabo ante ella, incluyendo la prueba documental y la transcripción de la evidencia oral admitida y la base sobre la cual actuó la agencia aparece claramente de dicho récord y está adecuadamente sostenida por la evidencia. Véase, *Ledesma, Admor.* v. *Tribl. de Distrito*, 73 D.P.R. 396.

No vemos cómo a falta de un estatuto que así lo requiera, puedan anularse las órdenes emitidas por el Administrador en este caso, a base de que no se formularon conclusiones como las exigidas por la Regla 43.1 de Procedimiento Civil.

*Se confirmará la sentencia dictada por el Tribunal Superior.*